## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

John Rice,

               Plaintiff,

v.

Nancy A. Berryhill, *Acting Commissioner of Social Security*,

               Defendant.

Case No. 17-cv-1462 (TNL)

**ORDER**

Benjamin L. Reitan and Jacob P. Reitan, Reitan Law Office, PLLC, 1454 White Oak Drive, Chaska MN 55318 (for Plaintiff); and

Bahram Samie, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis MN 55415 (for Defendant).

## I.    INTRODUCTION

Plaintiff John Rice brings the present action, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–34, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381. The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c) and D. Minn. LR 7.2. This matter is before the Court on the parties' cross motions for summary judgment. For the reasons set forth below, the Court denies Plaintiff's motion and grants Defendant's motion.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed the instant action for DIB and SSI in March 2014, alleging a disability onset date of October 30, 2011. Plaintiff alleges impairments of depression, anxiety disorder, and mood disorder. Plaintiff was found not disabled on February 4, 2015. That finding was affirmed upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge. A hearing was held January 13, 2016 and, on March 9, 2016, the ALJ issued a decision denying Plaintiff's claim for benefits. Plaintiff sought review of the ALJ's decision through the Appeals Council, which denied his request for review. Plaintiff then sought review in this Court.

### B. The ALJ's Decision

The ALJ found that Plaintiff had the severe impairments of: "major depressive disorder; generalized anxiety disorder; and chemical dependency reportedly in remission since October 2013." (Tr. 20). The ALJ next found and concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 20). The ALJ looked at Listings 12.04 (affective disorders), 12.06 (anxiety related disorders), and 12.09 (substance addiction disorders). (Tr. 20–23). Following this, the ALJ found Plaintiff has the residual functioning capacity ("RFC") to perform a full range of work at all exertional levels with certain nonexertional limitations: "limited to simple, routine, repetitive tasks; occasional changes in work setting; brief and superficial interaction with supervisors, co-workers, and the public; no complex decision-making; no rapid,

assembly-line paced work, defined as a meeting daily quotas but not hourly quotas; and no contact or access to illicit drugs or alcohol." (Tr. 23). The ALJ next concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, when considering his age, education, work experience, and RFC. (Tr. 30–31). Accordingly, Plaintiff was found not disabled from October 30, 2011 through the date of the ALJ's decision. (Tr. 31).

## III.   ANALYSIS

### A. Legal Standard

Disability benefits are available to individuals determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. § 404.1505(a). Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed

impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)); 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Boettcher*, 652 F.3d at 863 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). This standard requires the Court to "consider the evidence that both supports and detracts from the ALJ's decision." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012) (citing *Ellis v. Barnhart*, 393 F.3d 988, 993 (8th Cir. 2005)).

The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks*, 687 F.3d at 1091 (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578) (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, the court must affirm the [ALJ's] decision." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). In reviewing the record for substantial evidence, the Court may not substitute its own

judgment or findings of fact for that of the ALJ. *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Likewise, courts "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578.

Under 20 C.F.R. §§ 404.1527(c), 416.927(c), medical opinions from treating sources are weighed using several factors: (1) the examining relationship; (2) the treatment relationship, such as the (i) length of the treatment relationship and frequency of examination and the (ii) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. If a treating source's medical opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Treating sources are defined as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007). An ALJ "may give a treating doctor's opinion limited weight if it provides conclusory statements only." *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995)). And "[a] treating physician's own inconsistency may . . . undermine his opinion and diminish or

eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).

## B. The Opinion of Nurse Russell

Plaintiff asserts that the ALJ did not give any weight to, or even address, the March 27, 2013 opinion of psychiatric mental health certified nurse specialist Terri Russell. (ECF No. 13, at 5–6).

On March 27, 2013, Plaintiff saw Russell for a psychiatric diagnostic assessment. (Tr. 414–18). Plaintiff presented with daily functioning "significantly below baseline." (Tr. 414). Plaintiff reported depressive symptoms, mood swings, and significant levels of anxiety. (Tr. 414). Russell noted Plaintiff's "remarkable situational variables appear to be the same as the sources of stress." (Tr. 414). On examination, Plaintiff's activity was increased with frequent body movements and repositioning in his chair; speech was clear with increased rate and normal volume; he was alert and attentive; eye contact was generally good; mood was "quite agitated, anxious, and somewhat desperate"; cognitive functioning and estimated IQ appeared to be impaired at the time due to anxiety and depression; insight was fair; he was undergoing "significant situational stressors and changes" over the last 1.5 years; affect was extremely restricted; judgment and impulse control appeared to be fair at the time, but anxiety and depression may contribute to impulsive action; Plaintiff reported significant memory and concentration problems, but he was able to answer questions clearly during the interview; and he was oriented to time, place, person, and had clear thought processes. (Tr. 417). Russell's diagnosis was: major depressive disorder, recurrent, moderate; adjustment disorder with anxiety; and panic

disorder without agoraphobia ruling out generalized anxiety disorder. (Tr. 417). Plaintiff was to discontinue his sertraline[1] slowly, begin taking citalopram,[2] take lorazepam,[3] and begin individual therapy. (Tr. 417–18). Russell's summary was that Plaintiff was

> experiencing a wide variety of situational stressors which are contributing to his symptoms of depression and anxiety. [Plaintiff's] prognosis is good based on his history of stability and employment. If his symptoms are left untreated, he is at risk of continued or increased emotional turmoil. [Plaintiff's] symptoms include depression, anxiety, panic symptoms, mood changes and decreased memory and concentration. It appears these symptoms began in 2011. They have increased in intensity since July, 2012 and especially over the last few weeks. His degree of functional impairment is severe. [Plaintiff's] strengths include his intelligence, motivation for treatment, and willingness to participate in recommended treatment options.

(Tr. 418).

Contrary to Plaintiff's assertion, the ALJ did discuss this March 2013 psychiatric diagnostic assessment. (Tr. 24). Specifically, the ALJ recounted the mental status examination, Russell's assessment, Russell's medication decisions, and Russell's estimation of Plaintiff's prognosis. (Tr. 24). While the ALJ did not specifically quote the single sentence that Plaintiff cites—"His degree of functional impairment is severe"—it is clear the ALJ considered the March 2013 assessment. Thus, Plaintiff's argument that the ALJ did not address Russell's opinion is squarely contradicted by the record.

---

[1] Sertraline is an SSRI "used to treat depression, obsessive-compulsive disorder, panic disorder, premenstrual dysphoric disorder, posttraumatic stress disorder, and social anxiety disorder." *Sertraline (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012108/ (last visited September 17, 2018).

[2] Citalopram is an SSRI used to treat depression. *Citalopram (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/ (last visited September 17, 2018).

[3] Lorazepam is "used to treat anxiety disorders. It is also used for short-term relief of the symptoms of anxiety or anxiety caused by depression. Lorazepam is a benzodiazepine that works in the brain to relieve symptoms of anxiety." *Lorazepam (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010988/ (last visited September 17, 2018).

The Court now turns to Plaintiff's argument that the ALJ erred by failing to assign any weight to Russell's opinion. At the outset, the Court notes that Russell is not considered an "acceptable medical source" but instead an "other source" that the ALJ *may* use as evidence to show the severity of Plaintiff's impairments. 20 C.F.R. §§ 404.1513(d)(1), 406.913(d)(1). *Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006). "In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005); *Tindell*, 444 F.3d at 1005.

As the record shows, the March 27, 2013 assessment of Plaintiff by Russell was Plaintiff's first encounter with Russell. Thus, the only information Russell had to rely upon when making her assessment was Plaintiff's self-reported symptoms and the observations she made that day; there were no longitudinal considerations. As such, Russell's assessment that Plaintiff's "degree of functional impairment is severe" was made without any reference to Plaintiff's baseline capabilities. Moreover, Russell contemporaneously observed inconsistencies in Plaintiff's self-reported capabilities, noting that Plaintiff reported significant memory and concentration problems, but was nonetheless able to answer questions clearly during the interview. Russell's reliance on Plaintiff's self-reported capabilities that she herself called into question is misplaced and the ALJ was well within his discretion to consider these inconsistencies.

Russell's opinion that Plaintiff's "degree of functional impairment is severe" stands alone and includes no specific functional limitations. It was fair for the ALJ to afford no weight to Russell's opinion where it provided only a conclusory opinion.

*Samons*, 497 F.3d at 818 (citing *Chamberlain*, 47 F.3d at 1494). As best this Court can conclude, Russell could be referring to Plaintiff's daily functioning, which she stated was "significantly below baseline." Again, this evaluation is based on Plaintiff's self-reports which Russell herself questioned. Nonetheless, Russell's opinion that Plaintiff had severe functional impairment, with no additional description, provides nothing for the ALJ to weigh when determining Plaintiff's ability to work. *Beck v. Colvin*, 2016 WL 5923421, at *6 (N.D. Iowa Oct. 11, 2016) ("An ALJ need only give specific, legitimate reasons for discounting an opinion if it contains specific work functions and limitations.") (citing SSR 96-5p and 20 C.F.R. § 404.1527(a)(2), (e)). This single, conclusory sentence from an "other source" does not provide sufficient basis to find error in the ALJ's decision. *See Barnett v. Barnhart*, 363 F.3d 1020, 1022–23 (8th Cir. 2004).

The record of Plaintiff's treatment with Russell and her colleagues following his initial assessment undermines Russell's statement that Plaintiff's "degree of functional impairment is severe." In his first appointment following the assessment, on April 17, 2013, Plaintiff had anxious presentation, but less so than his previous appointment. (Tr. 340, 411). His mood was neutral and he was more optimistic towards future employment. (Tr. 340, 411). He was oriented x3, his judgment and insight were fair, but he appeared to make impulsive decisions. (Tr. 340, 411).

On April 23, 2013, following a hospitalization,[4] Plaintiff declined to work on his anxiety treatment until "he has started his new job and [is] settled in." (Tr. 338, 428).

---

[4] Plaintiff was hospitalized from April 5 through 8, 2013 when his sister reported Plaintiff had strange behaviors. (Tr. 539–48). Plaintiff's behavior was consistent with possible ingestion of excess quantities of

Plaintiff's mood appeared within normal limits; his affect was flat; his anxiety was within normal limits; his behavior was within normal limits; but he had disconnected thinking and difficulty with sequencing. (Tr. 337, 427).

On May 7, 2013, Plaintiff had anxious presentation following a problem at work, but his mood was positive and more optimistic. (Tr. 333, 408). Plaintiff reported significant improvement. (Tr. 333, 408).

On May 29, 2013, was sleeping and eating well following being laid off after three weeks of employment due to budget constraints at a local golf course. (Tr. 330–31, 423–24). Plaintiff reported his medications were stable and working well and that he had nothing to talk about in therapy and was to return as needed. (Tr. 331, 424). Indeed, Plaintiff discontinued treatment as of August 23, 2013, which was occurring on an as-needed basis, because he cancelled all but two appointments between April 18 and July 24. (Tr. 422, 326).

Plaintiff next had therapy on October 1, 2013, following ending a stint of employment on September 1. (Tr. 324, 402). Plaintiff "believe[d] his employer wanted him to leave. [He] was drinking at the time but he doesn't know if it played a part." (Tr. 324, 402). Plaintiff's mood was depressed, he was oriented x3, judgment and insight were poor, speech was clear with decreased rate and volume, thought processes were clear, recent and remote memory was fair, and affect restricted. (Tr. 324, 402).

---

lorazepam, but Plaintiff "denied taking lorazepam as a means of suicide attempt." (Tr. 539). Plaintiff reportedly took lorazepam "due to unclear instructions on bottle." (Tr. 539).

On November 15, 2013, Plaintiff was "highly organized" and anxious, "hygiene and grooming are immaculate," able to express himself verbally and speech was normal, thought processes were goal directed, and recent and remote memory were fair. (Tr. 321, 399). Plaintiff was similar in a visit on December 13, 2013; in addition, his concentration and attention were good and his judgment and insight were fair. (Tr. 318, 396). Plaintiff's "[d]epressive symptoms have remitted and he is sleeping well." (Tr. 318). Plaintiff was also doing well on January 17, 2014. (Tr. 315, 393).

Far from having "severe" functional impairment opined by Russell at their first meeting, this course of treatment shows continuous improvement. Indeed, as the record shows (and is discussed additionally below), Plaintiff did not attend any further mental health treatment until he began seeing Dr. Carrie Parente some four months later. This treatment record does not support the severe impairment opined by Russell. Thus, even if the ALJ were required to weigh her opinion, his rejection of Russell's opinion is supported by the record.

In sum, the ALJ's consideration of Russell's March 27, 2013 opinion is supported by substantial evidence in the record as a whole.

### C. The Opinion of Dr. Parente

Plaintiff's main argument is that the ALJ did not give appropriate weight to the opinion of Dr. Parente, his treating psychiatrist. (ECF No. 13, at 6–11).

On November 5, 2015, Dr. Parente completed a form entitled "Mental Impairment Questionnaire (RFC & Listings)."[5] (Tr. 531–37). Dr. Parente noted she had seen Plaintiff 11 times from April 2014 through October 2015. (Tr. 531). Dr. Parente indicated Plaintiff's diagnoses were: major depressive disorder, recurrent; alcohol use disorder; panic disorder; and adjustment disorder with anxiety. (Tr. 531). Dr. Parente noted Plaintiff's treatment of medication management, lifestyle changes, and therapy were "all equally as important." (Tr. 531). Dr. Parente indicated mental status examinations showed Plaintiff was "notable for blunted affect." (Tr. 531). Dr. Parente rated Plaintiff's prognosis as fair. (Tr. 531). In a check-the-box section, Dr. Parente noted Plaintiff's signs and symptoms, per Plaintiff's reports, are: anhedonia; decreased energy; blunt affect; feelings of guilt or worthlessness; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; substance dependence; emotional withdrawal or isolation; deeply ingrained, maladaptive patterns of behavior; autonomic hyperactivity; memory impairment;[6] and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. (Tr. 532).

In the next check-the-box section, Dr. Parente rated Plaintiff's mental abilities and aptitude to do unskilled work. (Tr. 533). Dr. Parente indicated Plaintiff had "limited but satisfactory" ability to be aware of normal hazards and take appropriate precautions.

---

[5] A check-the-box form used to provide a medical opinion limits its evidentiary value. *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011) (citing *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2011)); *Papesh v. Colvin*, 786 F.3d 1126, 1133–34 (8th Cir. 2015).
[6] Dr. Parente did not indicate, as the form permits, whether the memory impairment is short, intermediate, or long term. (Tr. 532).

(Tr. 533). Plaintiff has "seriously limited, but not precluded" ability to: understand and remember very short and simple instructions; carry out very short and simple instructions; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; ask simple questions or request assistance; and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (Tr. 533). Plaintiff is "unable to meet competitive standards" in the following areas: remember work-like procedures; maintain attention for two hour segment; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in a routine work setting. (Tr. 533). Plaintiff has "no useful ability to function" in these areas: maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and deal with normal stress. (Tr. 533). Dr. Parente declined to explain these limitations even though the check-the-box form asks for an explanation and provides space to do so. (Tr. 533).

Concerning Plaintiff's mental abilities and aptitude needed to do semiskilled and skilled work, Dr. Parente noted Plaintiff has "no useful ability to function" with respect to the following: understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; and deal with stress of semiskilled and skilled work. (Tr. 534). With respect to Plaintiff's mental abilities and aptitude for particular types of jobs, Dr. Parente rated Plaintiff as "seriously

limited, but not precluded" with respect to his ability to adhere to basic standards of neatness and cleanliness. (Tr. 534). Plaintiff is "unable to meet competitive standards" with respect to his ability to maintain socially appropriate behavior. (Tr. 534). And finally, Plaintiff has "no useful ability to function" with respect to the following: interact appropriately with the general public; travel in unfamiliar place; and use public transportation. (Tr. 534).

Concerning Plaintiff's functional limitations, Dr. Parente rated Plaintiff as having marked restriction of daily living activities, extreme difficulties in maintaining social functioning, extreme difficulties in maintaining concentration, persistence, and pace, and having one or two episodes of decompensation within a 12-month period. (Tr. 535). With respect to how Dr. Parente anticipated Plaintiff's impairments would cause him to be absent from work, Dr. Parente wrote that it "depends on the job." (Tr. 536). Dr. Parente indicated Plaintiff's impairment has lasted or can be expected to last at least twelve months. (Tr. 536). In response to a question asking whether Plaintiff is a malingerer, Dr. Parente did not check yes or no, but instead handwrote: "unknown, unlikely" followed by "but he likely overinflates his symptoms." (Tr. 536). Dr. Parente estimated Plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described in the evaluation. (Tr. 536). Dr. Parente noted Plaintiff's mental health does not preclude him from working with the general public and that alcohol or substance abuse does not contribute to his limitations. (Tr. 536). Dr. Parente did not indicate the earliest date that Plaintiff's symptoms and limitations applied. (Tr. 537).

In considering Dr. Parente's November 5, 2015 opinion, the ALJ gave it "little weight," noting:

> [Dr. Parente] assessed [Plaintiff] with severe and extreme limitations that would prevent him from performing unskilled work. In her opinion and assessment, Dr. Parente acknowledged that [Plaitniff's] symptoms and signs were based on his self-report. Dr. Parente provided no detail [sic] explanation or reasoning as to why the severe and extreme limitations were warranted. In her clinical note, October 2015, Dr. Parente indicated that [Plaintiff] was likely overinflating his mental symptoms. Dr. Parente also noted that [Plaintiff] reported he was "completely unable to function" but he was willing to consider an IOP as that would indicate he was severely ill. Moreover, as discussed thoroughly above, Dr. Parente's mental status examinations had remained without significant abnormalities. For these reasons, little weight has been placed on Dr. Parente's opinion and assessment.

(Tr. 29).

## 1. Examining and Treatment Relationship

Dr. Parente examined Plaintiff from April 2, 2014, (Tr. 311–14), through the date of her November 5, 2015 opinion, seeing him for 11 medication management appointments. Dr. Parente practices psychiatry and saw Plaintiff for his psychiatric needs. There is no dispute that Dr. Parente qualifies as a treating source given that she is a licensed physician. 20 C.F.R. §§ 404.1513(a), 416.913(a). Thus, Dr. Parente's examining and treatment relationships generally weigh in favor of Dr. Parente's opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c).

## 2. Supportability and Consistency

Plaintiff argues that the ALJ "cherry pick[ed] one statement from Dr. Parente's notes and turn[ed] it into a basis for defining her whole treatment record." (ECF No. 13, at 10). This Court disagrees. As noted, "[a] treating physician's own inconsistency

may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937 (citing *Prosch*, 201 F.3d at 1013). The record shows that Dr. Parente consistently expressed doubts about Plaintiff's self-reported symptoms. She even noted in her opinion itself that it was based on Plaintiff's self-reports, (Tr. 532), and that she believes Plaintiff likely "overinflates his symptoms," (Tr. 536). Nonetheless, Dr. Parente provided an opinion that endorsed those symptoms and disregarder her own doubts.

In his first meeting with Dr. Parente, on April 2, 2014, Plaintiff reported impaired memory/concentration, sleep, and appetite, low energy, dysphoric mood with "increased depression," severe anxiety, and stopping lamotrigine[7] because "it is for seizures." (Tr. 312, 390). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was clean and neatly attired; made good eye contact; his speech was regular; affect was blunted; thought process was linear and logical; his insight was good; and judgment was intact. (Tr. 312, 390). Dr. Parente encouraged exercise and healthy diet. (Tr. 313, 391).

On June 5, 2014, Plaintiff reported impaired memory/concentration, stating he had "zero" concentration and trouble with memory and focus; impaired sleep; impaired appetite, but Dr. Parente noted Plaintiff was drinking a Mountain Dew throughout the session; low energy; dysphoric mood as "extremely depressed"; and anxiety. (Tr. 370,

---

[7] Lamotrigine is used to treat seizures and bipolar disorder (manic-depressive illness). *Lamotrigine (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010856/?report=details (last visited September 17, 2018).

387). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was clean and appropriately attired; made good eye contact; his speech was regular; affect was blunted; thought process was linear and logical; his insight was good; and judgment was intact. (Tr. 370, 387). Plaintiff and Dr. Parente discussed a disability form. Plaintiff stated he thought "there was a miscommunication about the medical opinion form" and requested that Dr. Parente change it. (Tr. 370, 387). In only the second session with Plaintiff, Dr. Parente began noting a disconnect between Plaintiff's reported symptoms and her observations, writing the following:

> [Plaintiff] states "I am not doing well at all." We had a long discussion on disability, whether having disability changes the way he sees himself, the form I filled out last week, and information contained on the form. He said he had never tried to hide his alcohol abuse, but it was not an active issue when he first came to [treatment.] He respected the need for more information before I could complete the Medical Opinion form for disability more precisely.

(Tr. 370–71, 387–88). Plaintiff reported daily panic attacks, not sleeping well, unable to maintain daily hygiene, and problems with concentration and poor memory. (Tr. 371, 388). Dr. Parente had a "[l]ong discussion of sleep hygiene," but Plaintiff "appear[ed] reluctant to implement core strategies to help improve sleep." (Tr. 371, 388). Plaintiff was "reminded that no one action (including medication) is a magic cure-all, but all help incrementally and synergistically." (Tr. 371, 388).

On June 26, 2014, Plaintiff reported impaired memory/concentration; impaired sleep; no appetite; low energy; dysphoric mood as "extremely depressed"; and anxiety. (Tr. 367, 384). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was clean and appropriately attired; made good eye contact; his speech

was regular; affect was blunted; thought process was linear and logical; his insight was good; and judgment was intact. (Tr. 367, 384). Dr. Parente again "[r]eiterated how a healthy lifestyle is important in treating depression and anxiety." (Tr. 367–68, 384–85). Plaintiff reported he "gets some exercise" every other weekend when his son visits. (Tr. 368, 385). Dr. Parente recommended daily exercise. (Tr. 368, 385).

On August 11, 2014, Plaintiff reported impaired memory/concentration; impaired sleep; poor, inconsistent appetite; low energy; dysphoric mood as "horrible" and "extremely depressed"; and anxiety. (Tr. 364, 381). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was clean and appropriately attired; made good eye contact; his speech was regular; affect was blunted; thought process was linear and logical; his insight was good; and judgment was intact. (Tr. 364, 381). Plaintiff reported he "cannot get motivated to exercise." (Tr. 364, 381). Dr. Parente reminded Plaintiff that "regular exercise is part of his treatment plan." (Tr. 364, 381). Dr. Parente again discussed sleep hygiene. (Tr. 365, 382).

On September 22, 2014, Plaintiff reported impaired memory/concentration; impaired sleep; no appetite; no energy; mood changes; and anxiety. (Tr. 378, 361). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was clean and appropriately attired; made good eye contact; his speech was regular; affect was blunted; thought process was linear and logical; his insight was good; and judgment was intact. (Tr. 378, 361). Plaintiff was "in a hurry" and did "not want to discuss his mental health in depth." (Tr. 379, 362). Dr. Parente again recommended exercise. (Tr. 379, 362).

On October 27, 2014, Plaintiff reported impaired memory/concentration; impaired sleep; improved appetite; low energy; dysphoric mood; and anxiety, noting he "breathes through" panic attacks. (Tr. 375, 360). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was casually groomed; made good eye contact; his speech was regular; affect was blunted; thought process was organized; his insight was good; and judgment was intact. (Tr. 375, 360). Plaintiff was "unsure whether he [was] feeling better." (Tr. 375, 360). Dr. Parente noted Plaintiff "still has problems describing his symptoms and feelings." (Tr. 375, 360). Dr. Parente discussed the benefits of regular exercise, but Plaintiff "continued to be resistant." (Tr. 375, 360). Plaintiff also stated he would be unable to journal. (Tr. 375, 360). Plaintiff "continue[d] to have anxiety regarding finances and leaving his home. He hasn't heard back from social security." (Tr. 375, 360). Dr. Parente again recommended exercise. (Tr. 376, 358).

On January 5, 2015, Plaintiff reported impaired memory/concentration; impaired sleep; adequate appetite; poor/low energy; dysphoric mood; and anxiety with panic attacks every morning. (Tr. 524). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was casually groomed; made good eye contact; his speech was regular; affect was constricted; thought process was organized; his insight was good; and judgment was intact. (Tr. 524). Dr. Parente noted the following: "Discussed benefits (again) of regular exercise, but he continues to be resistant. He reports problems with short term memory, and states he is unable to read the newspaper or recall why he walked into a certain room. He does not forget to remind of having lawyer's letter photocopied." (Tr. 524). Plaintiff believed his "increasing paperwork" was

the cause for his panic attacks." (Tr. 524). Dr. Parente noted Plaintiff had not "increased exercise nor cut back on caffeine as recommended at his last appointment." (Tr. 525). Dr. Parente "strongly recommended (again) regular exercise 5-6 days/week as treatment for depression/anxiety." (Tr. 525).

On February 26, 2015, Plaintiff reported impaired memory/concentration with "more prob[lem]s with [short term] memory and focus; impaired, interrupted sleep; poor appetite; poor/low energy; dysphoric mood; and anxiety with panic attacks. (Tr. 520). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was poorly groomed; made good eye contact; his speech was regular; affect was blunted; thought process was organized; his insight was good; and judgment was intact. (Tr. 520). Plaintiff "ha[d] not increased exercise nor cut back on caffeine as recommended at his last appointment. Indeed, he has increased caffeine and tobacco use." (Tr. 520). Plaintiff stated he was denied social security. (Tr. 520). Plaintiff reported he could not see his son at a visitation be "he was just so depressed." (Tr. 521). Plaintiff reported he had not bathed for three weeks and was not "keeping up" his home, such as dishes or laundry. (Tr. 521). Plaintiff reported his anxiety and panic attacks have worsened, experiencing panic attacks thrice daily and his anxiety was worse in the morning and night. (Tr. 521). Dr. Parente prescribed a new medication—viibryd[8]—and noted it was ok for Plaintiff to put exercise "on hold for 1 month while waiting for medication to become therapeutic." (Tr. 521).

---

[8] Viibryd is the brand name for vilazodone, which is an SSRI used to treat depression. *Vilazodone (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012635/ (last visited September 17, 2018).

On April 16, 2015, Plaintiff reported impaired memory/concentration, both as "very, very poor"; variable sleep; variable appetite; no energy; dysphoric mood; and anxiety with severe panic attacks every morning. (Tr. 517). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was poorly groomed; made good eye contact; his speech was regular; affect was blunted; thought process was organized; his insight was good; and judgment was intact. (Tr. 517). Plaintiff experienced significant nausea with viibryd, so it was discontinued. (Tr. 517). Plaintiff "believe[d] much of his depression stems from environmental stressors. He is trying to send in all paperwork for benefits." (Tr. 518). Dr. Parente prescribed nortriptyline.[9] (Tr. 518).

On June 24, 2015, Plaintiff reported impaired memory/concentration; variable sleep; variable appetite; low energy; dysphoric mood; and anxiety with "pretty severe" panic attacks. (Tr. 514). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was poorly groomed; made good eye contact; his speech was regular; affect was blunted; thought process was organized; his insight was good; and judgment was intact. (Tr. 517). Plaintiff reported no benefit from the nortriptyline. (Tr. 514). Plaintiff reported mowing his sister's yard weekly with a push mower as his only exercise. (Tr. 514). Dr. Parente again "encouraged him to incorporate exercise into his daily life." (Tr. 514–15).

On October 28, 2015, Plaintiff reported impaired concentration; impaired sleep; poor appetite; low energy; dysphoric mood; and anxiety with severe panic attacks.

---

[9] Nortriptyline is used to treat depression. *Nortriptyline (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011451/ (last visited September 17, 2018).

(Tr. 528). On examination, Plaintiff was alert and oriented x3 and attentive to the conversation; he was cleanly groomed; made good eye contact; his speech was regular; affect was blunted; thought process was organized; his insight was good; and judgment was intact. (Tr. 528). Plaintiff stated he has "really been feeling bad" for the "past month and a half." (Tr. 528). Plaintiff reported "appetite poor, not sleeping, poor hygiene (says hasn't showered in a month), poor concentration, unable to get off of couch." (Tr. 528). Plaintiff reported issues with not being able to see his son. (Tr. 529). When Dr. Parente encouraged Plaintiff to attend therapy concerning his son more often than every two months, Plaintiff "appear[ed] surprised that therapy is usually more frequent." (Tr. 529). Dr. Parente then noted the following:

> I do not doubt [Plaintiff] suffers from significant debilitating depression. However I have difficulty believing the severity of all of [sic] symptoms he reports. For example, at first he reports not being able to sleep at all. When it was suggested trazodone[10] should be discontinued if it was not helping him sleep, he reports trazodone "helps sometimes" and will get 6-7 hours of sleep a night 3-4 days/week. He reports being "completely unable to function", but is unwilling to consider an Intensive Outpatient program as that would indicate he is severely ill.

(Tr. 529). Dr. Parente discussed changing medications because Plaintiff reported no significant benefit from nortriptyline, but Plaintiff "would prefer to increase dose of this medication as it 'may' have had mild benefit." (Tr. 529). Dr. Parente "[a]gain[] advised [Plaintiff] that exercise, therapy, healthy diet are not mere suggestions but are part of his treatment plan." (Tr. 529).

---

[10] Trazodone is used to treat depression. *Trazodone (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012504/ (last visited September 17, 2018).

Dr. Parente then completed her opinion approximately one week later, on November 5, 2015. It strains credulity to write "I have difficulty believing the severity of all of [the] symptoms [Plaintff] reports" to then complete a check-the-box form that endorses those same symptoms one week later, particularly where Dr. Parente started expressing doubts about Plaintiff's reported symptoms in their second ever meeting and continued expressing doubts throughout Plaintiff's course of treatment.

Dr. Parente was not alone among Plaintiff's treatment providers to doubt his reported symptoms. On April 1, 2013, in Plaintiff's first meeting with a therapist following the assessment by Russell, he "presented a somewhat convoluted and contradictory story of be[ing] kicked out of the home by the mother of his son, being homeless for the past several years[,] and having an on[]going dispute with her that was recently settled." (Tr. 346, 430). The clinician, Michael Scott, noted Plaintiff at times "was not consistent or sequential in his presentation. He stated at one time that he attempted to obtain disability for his psychological problems but then reported that he wanted a second opinion from Neurology because the Neurologist said he would work half time." (Tr. 346, 430).

About halfway through his treatment relationship with Dr. Parente, on April 3, 2015, Plaintiff started seeing Dr. Paul Hill for therapy for treatment of his depression and anxiety. Dr. Hill found Plaintiff to be "somewhat vague and perhaps a little defensive when describing his symptoms. However, on the intake forms he endorsed nearly every depressive and anxious symptom." (Tr. 559). Dr. Hill noted Plaintiff's "caffeine and nicotine use may well be contributing to his anxiety" but Plaintiff was "not willing to

consider controlling his use of these substances." (Tr. 559). Plaintiff reported isolating

himself "mainly because of his 'shame over not working.'" (Tr. 560). On examination,

Plaintiff was oriented x3; speech was normal; mood was depressed; flat affect; he had no

observed defects in memory; attention and concentration were intact and unremarkable;

judgment was good; and his motivation for treatment was "unclear." (Tr. 560). Dr. Hill's

plan, given Plaintiff's "currently level of inactivity and withdrawal" was to focus on

behavioral activation, addressing "routine physical exercise and a rationale for including

this in his daily routine," as well as increasing rewarding life activities. (Tr. 561).

On May 8, 2015, after discussing some concerns about Plaintiff and his son, Dr.

Hill noted Plaintiff was

> very anxious about disability. Concerned that he will not qualify and
> concerned that providers will not support him. Suggested that many
> providers believe it would be better for his depression and anxiety if he
> were to work. [Plaintiff] very reactive to this idea. Very anxious and noted
> that he does not believe he is capable of working. Feeling desperate about
> social security.

(Tr. 557).

On October 30, 2015, Dr. Hill asked Plaintiff to "produce evidence of the anxiety

and any logical basis for [his] extensive worry. [Plaintiff's] fears were analyzed" and his

"ability to control the outcome of circumstances was examined, and the effectiveness of

his worry on that outcome was examined also." (Tr. 551). Plaintiff "responds during

session, but not clear that intervention has lasting impact." (Tr. 551).

On November 13, 2015, Dr. Hill noted that Plaintiff

> very quickly engages in catastrophic thinking and panic. [Dr. Hill] [g]ently
> suggested that [they] should start talking about a secondary plan in case he

is not approved for SSDI. [Plaintiff] immediately panic[k]ed and interpreted that to mean [Dr. Hill] did not think he was going to get SSDI, that [Dr. Hill] was not supporting him, etc.

(Tr. 549). Dr. Hill noted Plaintiff "has no alternative plan and engages in dire negative thinking and hopelessness." (Tr. 549). Plaintiff reported that he cannot manage anxiety now that he is sober. (Tr. 549). Dr. Hill "[r]evisited idea of day treatment," and Plaintiff was "angry with psychiatrist for suggesting this." (Tr. 549). Dr. Hill explained "this was [a] logical recommendation when people are not improving from current treatment regimen." (Tr. 549). Plaintiff "[c]ontinues to say that he will consider day treatment." (Tr. 549).

Thus, rather than "cherry pick[ing] one statement from Dr. Parente's notes and turn[ing] it into a basis for defining her whole treatment record," (ECF No. 13, at 10), the ALJ appropriately limited the weight of Dr. Parente's opinion due to a common thread running throughout Plaintiff's mental health treatment: that his providers questioned Plaintiff's reports.

Additionally, as the record above shows, Dr. Parente repeatedly stressed the importance of exercise and other non-pharmacological life changes in treating Plaintiff's depression and anxiety. Plaintiff, however, was noncompliant with this portion of his treatment plan. Dr. Parente was not alone in stressing such treatment for Plaintiff as a remedy to his ailments, because on July 31, 2015, Dr. Hill developed a "plan for routine physical exercise" with Plaintiff and "a rationale for including this in his daily routine." (Tr. 555). A "claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining

25

whether to give that opinion controlling weight." *Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008). Thus, it was not error to discount Dr. Parente's opinion given Plaintiff's noncompliance with treatment, particularly where Dr. Parente's opinion did not account for Plaintiff's noncompliance. *See id.* ("In light of Owen's failure to attend his physical therapy appointments, *stop smoking, and follow regular exercise and dietary plans*, the ALJ did not err in considering Dr. Paulsrud's failure to account for Owen's noncompliance.") (emphasis added).

Plaintiff asserts that Dr. Parente's recommendation of intensive outpatient treatment and his subsequent commencement of such treatment lends support to Dr. Parente's opinion. The Court disagrees. First, the treatment notes from October 28, 2015 included a sizable recitation outlying Dr. Parente's doubts concerning Plaintiff's reported symptoms. Within that recitation, Dr. Parente wrote that Plaintiff "reports being 'completely unable to function', but [he] is unwilling to consider an Intensive Outpatient program as that would indicate he is severely ill." (Tr. 529). In her treatment plan following this session, Dr. Parente's recommendations were regular exercise, decreased tobacco use, decreased caffeine use, and returning in two to three months. (Tr. 529). Far from being a recommendation for immediate psychiatric intervention, these recommendations were in line with Dr. Parente's previous recommendations and display no urgency whatsoever. Instead, the consideration of intensive outpatient treatment appears to be Dr. Parente's challenge of Plaintiff's self-reported symptoms. Put simply, Plaintiff's unwillingness to consider intensive outpatient treatment, combined with his

continued noncompliance with simple recommendations such as minimal daily exercise, undermined Plaintiff's claim that he was "completely unable to function."

Turning to Plaintiff's assertion that he in fact entered an intensive treatment program, the only record is from April 19, 2016 when Plaintiff had an initial day treatment diagnostic assessment. (Tr. 564–68). Plaintiff reported high levels of anxiety and that his depression symptoms "have increased since he was declined social security disability benefits." (Tr. 565). Plaintiff reported trouble sleeping and inability to do daily activities. (Tr. 565). On examination, Plaintiff was oriented x3; made intermittent eye contact; was well-groomed; had normal speech; mood was anxious, depressed, and irritable; his affect was flat; logical thought content; and focused attention span and concentration. (Tr. 566–67). Plaintiff reported his depression, anxiety, and panic attack symptoms started in childhood. (Tr. 567). The assessing therapist recommended Plaintiff begin a day treatment program to "learn anxiety reducing techniques to decrease the frequency and intensity of his panic attacks so that he is able to return to the workforce." (Tr. 568). Thus, while this assessment recommends Plaintiff begin a day treatment program, there is scant to no evidence that he actually began such a program.

Moreover, the ALJ already considered evidence that Plaintiff was referred to intensive outpatient treatment as of January 5, 2016. (Tr. 563, 40, 50). The fact that Plaintiff did not undergo an assessment until three months later undercuts the severity of the symptoms alleged. As such, Plaintiff's supposed initiation of an intensive treatment program over six months after Dr. Parente's opinion, three months after referral, and one

month after the ALJ denied Plaintiff's application for benefits does not serve to buttress Dr. Parente's opinion after-the-fact.

In sum, based on the foregoing, the ALJ's weighing of Dr. Parente's November 5, 2015 opinion is supported by substantial evidence in the record as a whole.

## IV.     CONCLUSION

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 12), is **DENIED**, Defendant's Motion for Summary Judgment, (ECF No. 14), is **GRANTED**, and this matter is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: September 17, 2018                               _____*s/ Tony N. Leung*_____
                                                       Tony N. Leung
                                                       United States Magistrate Judge
                                                       District of Minnesota

                                                       *Rice v. Berryhill*
                                                       Case No. 17-cv-1462 (TNL)